**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-14-08073-PCT-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Corbert Goldtooth, | |
| Defendant. | |

Defendant Corbert Goldtooth has filed a motion to suppress statements he made during an interview with law enforcement officers.  Doc. 47.  The motion is fully briefed (Docs. 50, 59), and the parties agreed at a status conference on June 2, 2015, that an evidentiary hearing was not necessary (Doc. 52).  The Court has reviewed a transcript and an audio recording of Defendant's interview, and concludes that the motion to suppress should be denied.

## I.     Background.

Virgil Teller was found dead with multiple stab wounds on July 31, 2011, in his home in Fort Defiance, Arizona.  Earlier, at approximately 3:00 a.m. that morning, officers from the Navajo Nation Department of Public Safety conducted a traffic stop on a vehicle driven by Valerie Apachito after receiving information that the occupants were involved in a possible robbery.  The passengers in the vehicle were Defendant Corbert Goldtooth, his son Gage Goldtooth, and Myron Tsosie.

Defendant and Tsosie were transported directly to the Window Rock Detention

Center for public intoxication.  Defendant's son had a laceration on his hand and was transported to a local hospital for treatment before being booked for public intoxication. All three were released the next morning, before Teller's body was found.

When Navajo officers stopped the vehicle in which Defendant and the others were riding, they observed a shiny object being thrown from the passenger window.  A knife was later located in the area where the object was thrown.  Eventual tests on the knife revealed Virgil Teller's blood.

Defendant and his son were arrested on August 11, 2011, in connection with the robbery for which they were originally stopped.  They were again housed at the Window Rock Detention Center.  Defendant was interviewed at the Center two days later, on August 13, 2011, regarding the murder of Virgil Teller.  He was interviewed by FBI Special Agent Matt Shelley and Navajo Criminal Investigator Mike Henderson.

Defendant was advised of his *Miranda* rights both orally and in writing at the beginning of the interview.  Defendant consented to be interviewed and signed an advice of rights form.   The interview was audio recorded, and the recording has been transcribed.  *See* Doc. 50-1.

Defendant told the agents that he was almost 40 years old and had received his GED degree.  He said he had been drinking the night of his arrest with his son, Gage.  He said that he and Gage visited Tsosie, and the three of them later obtained a ride from Valerie Apachito before being pulled over and arrested for public intoxication.

When asked about the knife thrown from the vehicle, Defendant acknowledged that he had thrown the knife.  He explained that he and Tsosie were both convicted felons and therefore sought to discard the weapon before being arrested.  Defendant denied any knowledge of Virgil Teller's murder.

Agent Shelley then told Defendant that Teller's blood had been found on the knife. Agent Shelley observed that there had to be an explanation as to why Teller's blood was on a knife Defendant had thrown from the car, and told Defendant that he had "one shot"

to provide an explanation.  Doc. 50-1 at 22.[*]

Agent Shelley recounted other information he had obtained, including information concerning disputes within a gang to which Defendant and Virgil Teller belonged.  He also mentioned Defendant's son, saying:  "I know Gage got some cuts on his hand the same night."  *Id*. at 23.  The officer then said:  "I mean, anything you can do to enlighten me, get yourself out of a mess – you know what I mean?  Because it's not looking too good . . . right now."  *Id.* at 24.

At this point in the conversation, Defendant asked "[w]here's my son?"  *Id*.  Agent Shelley responded that Gage was in custody in the same facility, but that Shelley had not yet spoken to him.  Agent Shelley then said:  "Seem like a guy that looks after your son, right?  I mean, I know you guys bang together a little bit."  *Id*.  A few moments later, the agent said:  "But, it seems to me that, you know – seems to me you're kind of protective of your son."  *Id.* at 24-25.  Defendant responded:  "Yeah, pretty much."  *Id*. at 25.

Agent Shelley then said:  "I'll be quite frank with you, you know, things are kind of looking at him like not so good.  And I know he – you don't – you've been in.  You don't want him to go in I'm sure.  Am I right?"  *Id*.  Defendant said "Yeah."  *Id*.

Agent Shelley stated that a collection of evidence had occurred at Teller's house, including the collection of blood.  He noted that not all of the blood was Teller's.  He said:  "I need to know about it.  You know, if it's self-defense or whatever, or if, you know, it just started out as a melee, and just got out of hand, whatever, I just need to know."  *Id*. at 26.  The officer said:  "You're in a tough spot.  Am I right?"  *Id*.

Defendant asked for a drink of water, and the officers provided it to him.  Defendant then said:  "My son didn't have nothing to do with it."  *Id*.  Defendant proceeded to explain that he, his son, and Tsosie went to Teller's house to ask Teller about an altercation that occurred the day before with other gang members.  Defendant said he was not going with any ill intent.  He said Teller's door was partially open, and

---

[*]Citations to documents in the Court's docket are to page numbers attached by the CMECF system at the top of each page, not original page numbers on the documents.

when Gage pushed it completely open, Teller swung a machete at Gage, hitting him in the hand and cutting it severely.  Defendant noted that he was already intoxicated when he saw Teller "trying to hurt my son[.]" *Id.* at 27.  "I just got out of hand, you know." *Id.* Defendant proceeded to explain that he lost control and stabbed Teller with the knife. After providing the additional detail, Defendant said:  "Like I said, my son didn't have nothing to do with it, you know." *Id.* at 29.  Defendant also said Tsosie "didn't do anything either." *Id.* at 30.

## II.     Legal Standards.

"In determining the voluntariness of a confession, a court 'examines whether a defendant's will was overborne by the circumstances surrounding the giving of a confession.'" *Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir. 2011) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)).  The Court must consider the totality of the circumstances, including "the characteristics of the accused and the details of the interrogation." *Id.*  When a confession is challenged, the government must establish voluntariness by a preponderance of the evidence.  *United States v. Bautista*, 362 F.3d 584, 589 (9th Cir. 2004).

## III.    Analysis.

Defendant argues that the interrogating officers preyed on his family emotions and thereby coerced him to confess.  Defendant relies on three cases.

In *Lynumn v. Illinois*, 372 U.S. 528 (1963), the Supreme Court reversed a defendant's conviction on the ground that her confession was coerced.  The Supreme Court provided this explanation:

> It is thus abundantly clear that the [defendant's] oral confession was made only after the police had told her that state financial aid for her infant children would be cut off and her children taken from her if she did not "cooperate."  These threats were made while she was encircled in her apartment by three police officers and a twice convicted felon who had purportedly "set her up."  There was no friend or adviser to whom she might turn.  She had no previous experience with the criminal law, and had no reason not to believe that the police had ample power to carry out their threats.

*Id*. at 534.

In *Haynes v. Washington*, 373 U.S. 503 (1963), the Supreme Court reversed the defendant's conviction because his written confession was coerced.  The defendant was held for approximately 16 hours while being denied any opportunity to call his wife or attorney.  Interrogating officers told the defendant that he would continue to be held with no ability to contact his family or lawyer until he confessed in writing.  The Supreme Court explained:

> The [defendant] at first resisted making a written statement and gave in only after consistent denials of his requests to call his wife, and the conditioning of such outside contact on his accession to police demands. Confronted with the express threat of continued incommunicado detention and induced by the promise of communication with and access to family, Haynes understandably chose to make and sign the damning written statement[.]

*Id.* at 514.  The Supreme Court added this observation: "We cannot blind ourselves to what experience unmistakably teaches: that even apart from the express threat, the basic technique present here – the secret and incommunicado detention and interrogation – are devices adapted and used to extort confessions from suspects."  *Id.*

In *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981), the Ninth Circuit reversed the defendant's conviction because her confession was coerced.  The Defendant was held in the back of a police car and questioned by two officers for an hour.  *Id.* at 1333.  The Ninth Circuit provided this explanation:

> In this case, the threat was not as explicit nor as extreme, but the coercive purpose and effect are indistinguishable from that in *Lynumn*.  Agent Sibley recited a virtual litany of maximum penalties for the crime of which Tingle was suspected, totaling 40 years imprisonment.  He expressly stated, in a manner that could only be interpreted in light of the lengthy sentences he had described, that Tingle would not see her two-year-old son "for a while."  Referring specifically to her child, Sibley warned her that she had "a lot at stake."  Sibley also told Tingle that it would be in her best interests to cooperate and that her cooperation would be communicated to the prosecutor.  He also told her that if she failed to cooperate he would inform the prosecutor that she was stubborn or hard-headed.

*Id.* at 1335-36.

The interrogations in *Lynumn*, *Haynes,* and *Tingle* each included an appeal to family sentiments in an otherwise coercive environment.  They do not mean every reference to a suspect's family during interrogation renders a subsequent confession

involuntary.  As the Ninth Circuit has explained, "*in extreme cases*, appealing to a defendant's moral obligation to his or her family as leverage to coerce is unconstitutional."  *Ortiz v. Uribe¸* 671 F.3d 863, 872 (9th Cir. 2011) (emphasis added).  The Ninth Circuit further explained that references to family members could, in appropriate circumstances, be considered a permissible interrogation technique: "Detective Cardwell simply reminded Ortiz of his obligation to his family to tell the truth and that his children were counting on him to do the right thing.  These permissible psychological appeals to his conscience, although possibly making him emotional during the interview, do not demonstrate that his will was overborn." *Id.*

After considering the totality of the circumstances in this case, the Court concludes that Defendant's will was not overborn by the interrogation techniques of the officers.  The Court bases this conclusion both on Defendant's characteristics and the details of the interview.  *Doody*, 649 F.3d at 1008.

Defendant was 39 years old at the time of the interview.  He had a GED degree, was articulate, and had substantial experience in the criminal justice system, including many previous misdemeanor convictions and at least one prior felony conviction.  The interview transcript and tape suggest that Defendant fully understood the nature of the interview and the questions that were asked.

Defendant had been in custody at the Detention Center for two days on another charge.  He was familiar with the Center, having been incarcerated there before.  Defendant listened to and read the *Miranda* warnings, consented to be interviewed, and signed a waiver of rights form.  Questioning by the two officers was not loud, oppressive, or overbearing; it was conversational and friendly.

The discussion of Defendant's son was not an irrelevant appeal to family emotions.  His son, Gage, had been arrested with Defendant, in a vehicle where the apparent murder weapon was carried, and had a severe cut on his hand.  Defendant admitted that he "banged" with his son, an apparent reference to gang activity (Doc. 50-1 at 24), and was drinking and intoxicated with him on the night in question.  Discussion of

Gage's possible involvement in the murder was thus a relevant and logical line of inquiry, as were questions about Tsosie's possible involvement.

The officers first mentioned Gage only with respect to the cut on his hand. This led Defendant to ask where his son was, and prompted the ensuing discussion. The officers did not threaten Defendant. They did not make promises of leniency toward Gage. They did imply that Gage was a suspect in the murder – a true statement given the facts from the night of the traffic stop – and did appeal to Defendant's interest in protecting his son. But the Court views this line of questioning, in light of all the surrounding facts, as akin to the family-related questions in *Ortiz*, which the Ninth Circuit found to be a "permissible psychological appeals to [Defendant's] conscience." *Ortiz¸* 671 at 872. Indeed, a discussion of Gage's involvement was a more relevant and natural topic of inquiry than the mention of family in *Ortiz*.

Although it is true that the discussion of Defendant's son appears to have been a turning point in the interrogation, this fact is consistent with a desire on Defendant's part to take responsibility for a crime Defendant committed. Defendant not only made clear that his son was not involved in the stabbing, but also that Tsosie was not involved. This suggests that Defendant's confession was an acceptance of his responsibility for the murder, not simply a capitulation to coercive family-related questions. A review of the entire interrogation leaves the Court firmly convinced that Defendant's will not was overborn.

This case is distinguishable from the circumstances in *Lynumn* where officers specifically threatened that financial aid would be cut off to the suspect's children and she would not see them again unless she cooperated. The suspect was questioned while encircled in her apartment by three police officers and a twice-convicted felon who had set up the purported drug buy, and she was inexperienced in the criminal law and had no reason to disbelieve the threats. *Lynumn,* 372 U.S. 534.

This case is also distinguishable from *Haynes*, where officers specifically held the defendant incommunicado and told him that he would be permitted to contact his family

and lawyer only after he confessed.  As the Supreme Court noted, the tactics of secret and incommunicado interrogation were "devices adapted and used to extort confessions from suspects."  373 U.S. at 514.

This case is also distinguishable from *Tingle*.  The officers in *Tingle* recited maximum penalties for the crimes being faced by the suspect, totaling 40 years, and then told her she would not see her two-year-old child "for a while."  They suggested it would be in her best interests to cooperate and that her cooperation would be communicated to the prosecutor.  The interrogation occurred while the suspect was sitting in a police car with two officers.  The environment was sufficiently pressurized to cause the suspect to begin sobbing and shaking.  658 F.2d at 1333-34, 1336.

Comparable coercion and pressure were not brought to bear on Defendant in this case.  The interview was calm, Defendant was experienced in the criminal justice system, he knowingly waived his rights, no threats were made, and the discussion of his son was a relevant and logical outgrowth of his son's involvement on the night in question.  By more than a preponderance of the evidence, the Court finds that Defendant's confession was voluntary.

**IT IS ORDERED** that Defendant's motion to suppress (Doc. 47) is **denied.**  Excludable delay pursuant to U.S.C. § 18:3161(h)(1)(D) is found to run from **5/21/2015**.

Dated this 12th day of June, 2015.

David G. Campbell
United States District Judge